UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAMERON JOSEPH TIETZ,

    Petitioner,

v.

RANDALL HAAS, *Warden*,

    Respondent.

Case No.16-cv-14311
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS [1]**

---

Cameron Tietz shot and killed his friend. He maintained that he did not know that there was a bullet in the gun's chamber and that the shooting was an accident. A jury found that Tietz at least "knowingly created a very high risk of death or great bodily harm" when he shot his friend and so it convicted Tietz of second-degree murder instead of involuntary manslaughter. After pursuing appeals and post-conviction relief in the state courts, Tietz filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Among other claims, Tietz asserts that his trial and appellate attorneys were both ineffective, that the prosecutor committed misconduct by introducing prohibited evidence, and that his due process rights were violated.

For the reasons that follow, the Court will deny Tietz's petition.

**I.**

The Michigan Court of Appeals summarized the facts surrounding Tietz's offenses as follows:

> On April 17, 2010, Tietz shot James Miller in the chest in Miller's home. Jade Okoneski, Alisha Harris, and Brenton Dow were at the home at that time. Okoneski and Dow both testified that Miller and Tietz started to talk about $10 that Miller's father owed Tietz. Harris testified that Miller and Tietz were speaking "in a playful manner," and Okoneski testified that Miller appeared relaxed and not angry. Harris

testified that Tietz asked Miller if he was going to pay him, and that Miller smiled and asked Tietz what would happen if he did not pay him. Okoneski testified that she saw Tietz reach into his waist, remove a gun, and cock it.

Okoneski, Harris, and Dow each testified that Tietz pointed the gun at Miller and fired it. Okoneski testified that both Miller and Tietz appeared "shocked" when the gun discharged. Okoneski testified that everyone ran out of the house. Dow testified as Tietz ran to his truck, he told Dow to "cover him." Dow testified that he returned to call the police and attempt to stop Miller's bleeding.

Detective Terry Coon arrested Tietz. According to Detective Coon, Tietz stated that he found the gun in a car that he had recently purchased, and did not look in the chamber. Tietz claimed that he was sitting at the dining room table and passing the gun around when a dog ran through the room and bumped into him. At that point, the gun went off.

Detective Coon testified that when he informed Tietz that his story was inconsistent with the other witnesses' accounts, Tietz told him that Miller was teasing him about $10, that they were joking, and that he wanted to "dry-fire" the gun without any bullets in the chamber to scare Okoneski and Harris. Tietz told Detective Coon that he obtained the gun the day before because he was concerned for his safety, and he did not think that any bullets were in the chamber.

Tietz's testimony was consistent with that of the other witnesses. He testified that he and Miller were being playful, and that he thought the gun would dry-fire and scare the girls. Tietz insisted that the shooting was an accident.

Detective–Sergeant Ryan Larrison of the Michigan State Police testified that . . . a person would have to cock the weapon and then pull the trigger for it to fire.

Officer Kenneth Shingleton of the Michigan State Police testified that on November 3, 2009, he searched Tietz and removed a different nine millimeter semi-automatic gun from his waistband. The prosecution argued that this evidence showed that the shooting was not an accident or a mistake.

*People v. Tietz*, No. 309767, 2013 WL 3107325, at *1 (Mich. Ct. App. June 20, 2013) (paragraphing altered).

Following a trial in Michigan's 7th Judicial Circuit Court (the circuit court for Genesee County), the jury found Tietz guilty of second-degree murder, carrying a concealed weapon, and possession of a firearm during the commission of a felony. *Id.*

Tietz's direct appeal raised two issues. The first was that the trial court erroneously failed to instruct the jury on reckless discharge of a firearm. The Michigan Court of Appeals found that reckless discharge was a "cognate" lesser offense (an offense that has at least one element not found in the greater offense) and applied a state-law rule prohibiting trial courts from instructing on cognate lesser offenses. *See id.* at *2. Tietz also argued that the trial court erred in its judgment of sentence. The court of appeals agreed and remanded for the judgment to be corrected to reflect that Tietz's prison terms for carrying a concealed weapon and for felony-firearm were concurrent. *Id.*

The Michigan Supreme Court denied leave to appeal. *People v. Tietz*, 839 N.W.2d 457 (Mich. 2013).

Tietz returned to the state trial court with a motion for relief from judgment, raising a number of issues. The court denied Tietz's motion for relief on all issues. (ECF No. 9-11, PageID.919–910.)

The Michigan Court of Appeals and Supreme Court denied Tietz leave to appeal in standard form orders. *See People v. Tietz*, No. 326812 (Mich. Ct. App. Aug. 26, 2015); *People v. Tietz*, 881 N.W.2d 478 (Mich. 2016).

## II.

The Antiterrorism and Effective Death Penalty Act (AEDPA) (and 28 U.S.C. § 2254 in particular) "confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). If a claim was "adjudicated on the merits in State court proceedings," this Court cannot grant habeas corpus relief on the basis of that claim "unless the adjudication of the claim . . . resulted in a decision" (1) "that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

If the state courts did not adjudicate a claim "on the merits," this "'AEDPA deference' does not apply and [this Court] will review the claim de novo." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014). However, "'[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.'" *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (quoting *Harrington*, 562 U.S. at 99).

## III.

### A.

The warden argues that Tietz procedurally defaulted several of his theories of ineffective assistance of counsel by not arguing them on direct appeal or collateral review. Tietz replied that the state waived affirmative defenses by failing to respond to his motion for relief from judgment in the trial court.

Having reviewed the pleadings and the record, the Court finds that, given the complexity of the procedural-default issues, the interests of judicial economy are best served by addressing the merits of Tietz's claims. *See Thomas v. Meko*, 915 F.3d 1071, 1074 (6th Cir. 2019).

### B.

The Court begins with Tietz's assertion that his trial counsel, Michael Ewing, was constitutionally ineffective.

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v.*

*Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To succeed on the performance prong, Tietz must identify acts that were "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. To satisfy the prejudice prong, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Tietz says that Ewing failed to call certain witnesses. (ECF No. 1, PageID.31.)

The state trial court addressed this claim in denying Tietz's motion for relief from judgment. The court ruled, "[i]n his brief, [Tietz] articulates the standard of conduct expected of a criminal defense attorney. However, [Tietz] fails to state in what manner the standard of conduct was breached by his attorney." (ECF No. 9-11, PageID.910.)

When, as here, a state court has rejected a petitioner's ineffective-assistance claim "on the merits," Supreme Court precedent "require[s] that the federal court use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *accord Harrington*, 562 U.S. at 105. So the question is not whether trial counsel performed adequately; the question is whether the state trial court was unreasonable in finding that counsel performed adequately.

The state trial court's determination was not unreasonable. "[D]efense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *See Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (citation omitted). In support of his motion for relief from judgment, Tietz submitted affidavits from three witnesses who Ewing did not call to testify. Each lay witness that Tietz identifies states, "I tried to give Cameron Tietz's attorney, Michael Ewing information pertaining to his case and the relationship/friendship between Cameron Tietz and the deceased James Miller." (ECF No. 9,

PageID.903–07.) Without greater detail, it is impossible to evaluate the exculpatory value of these witnesses' testimony and thus impossible to conclude that counsel was ineffective for not calling them. And it is doubtful these witnesses' testimony would have gone to the key issue (Tietz's state of mind when he shot Miller): none of these witnesses were present at the time Miller was shot. As for Tietz's assertion that an expert witness should have been called, Tietz has not adequately explained how an expert would have helped his defense.

Tietz's remaining ineffective assistance claims do not survive de novo review. (It may well be that all of these claims should be analyzed under 28 U.S.C. § 2254(d); but given that the state trial court expressly addressed counsel's failure to call witnesses but did not expressly address Tietz's other assertions about counsel (ECF No. 9-11, PageID.910), and because it makes no difference to the outcome, the Court addresses these claims de novo.)

Tietz claims trial counsel provided inadequate representation with respect to plea negotiations. According to Tietz, at some point during the trial, the judge told the prosecution, get "back there and negotiate a plea. You're losing this case." (ECF No. 1, PageID.26.) According to Tietz, Ewing returned from the meeting with the prosecutor and stated that the offer was for 10 years. (*Id.*) Tietz told Ewing he wanted to take the offer, but Ewing said, "No. We're winning." (*Id.*) Tietz also implies that Ewing was overconfident because he had dated the prosecutor. (ECF No. 1, PageID.27, 34.)

Tietz has not shown that Ewing's advice was not competent. First, Tietz does not cite to a transcript page where the judge allegedly referenced a plea. Nor does Tietz explain the state of the trial at the time Ewing allegedly advised him to reject the plea. It may well have been true that Tietz was "winning"—or that Ewing reasonably believed he was. And it may well have been reasonable to pursue an involuntary manslaughter conviction over a guaranteed ten years in prison.

6

Relatedly, Tietz alleges that his trial counsel "unilaterally rejected a plea offer made by the prosecution and refused to disclose what sort of plea it was." (ECF No. 1, PageID.30.) It appears that Tietz is referring to a second plea offer because, according to him, an offer for 10 years was conveyed. But Tietz has no evidence of a second plea offer nor does he provide any of the circumstances surrounding this alleged second offer. As such, he has not carried his burden of establishing a *Strickland* violation.

Tietz also faults his counsel for not making certain objections.

For one, Tietz says his counsel should have objected to the prosecution's use of a letter he wrote to Carretta Russell. (ECF No. 1, PageID.32.) On cross examination of Tietz, this exchange occurred: "Q. So, you've written her a letter? A. Yes. Q. And in one of those letters, I told her, I got money, powers, rides and straps. You said that, didn't you? A. Yes. Q. And straps are guns, right? A. Right." (ECF No. 9, PageID.645.) Perhaps counsel had grounds to object: the trial court had stated that the prosecution was not entitled to use the letter until it ruled on its admission and the trial court never did rule on its admission. (ECF No. 9, PageID.207–08.)

That said, the Court cannot say that it was an unreasonable strategic decision not to object. Counsel could have reasonably thought an objection was not likely to succeed and the better course was to address the letter on redirect. In fact, that is exactly what counsel did: "Q. Let's talk about that letter for just a second. . . . [W]hat was that referring to? A. I had received threats from people about if I ever come back to my neighborhood that I wouldn't leave alive. Q And, so, what was the point of writing that sentence in the letter? A. To intimidate 'em to not say them kind of things about me." (ECF No. 1, PageID.32.) Given that an objection might not have been sustained and the ability to address the letter on redirect, Tietz has not shown that counsel's failure to object was constitutionally deficient.

Tietz also asserts that Ewing was ineffective for failing to object to the introduction of evidence that authorities found Tietz with a gun months prior to the shooting. (ECF No. 1, PageID.32.) This claim fails; counsel did object. (ECF No. 9-5, PageID.554.)

Tietz faults his attorney for not objecting to juror misconduct during jury selection. (ECF No. 1, PageID.34.) Tietz is apparently referring to the fact that two jurors indicated that they could not be fair because they had previously been victimized in a crime similar to the charged offense. But a juror's truthful response in voir dire is not misconduct and is not something that warrants an objection from counsel. Those issues are dealt with, if at all, on challenges for cause or peremptory challenges. In any event, a review of the trial transcript (admittedly, the transcript is not entirely clear) indicates that the jurors who stated they had been victims of assaults ultimately stated they could be fair. (ECF No. 9-3, PageID.236–240.)

Finally, Tietz argues that trial counsel was generally not prepared for trial. Tietz asserts that Ewing told him that he had gone to lunch with the prosecutor, that he and the prosecutor had dated, and that he could get the prosecutor to reduce the charge to reckless discharge of a firearm. (ECF No. 1, PageID.26.) According to Tietz, when he asked Ewing to help him get ready for trial, Ewing said, "I don't need to do that because we aren't going to trial. I got this case fixed." (ECF No. 1, PageID.26.) Tietz further argues that when he raised with Ewing the need to investigate, Ewing said, "Well, when you don't pay what I asked, you don't get anything done. That's the way it is." (ECF No. 1, PageID.27.)

Tietz has not shown that Ewing's investigation into the case was short of "prevailing professional norms." *Strickland*, 466 U.S. at 688. It was beyond reasonable dispute that Tietz shot Miller. So going into trial, the only reasonable strategy for Ewing was to show that Tietz shot Miller accidentally. In other words, the issue for trial was Tietz's state of mind when he pulled the

trigger. And the evidence most pertinent to that issue was evidence of what happened in the moments immediately before and after Miller was shot. And Tietz has not shown that Ewing failed to talk to the people that were present (Jade Okoneski, Alisha Harris, and Brenton Dow) before trial or, at least, knew what they planned to say. Indeed, Ewing's opening statement indicates familiarity with the events immediately preceding and after Miller's death, including what Okoneski, Harris, and Dow saw and said. (ECF No. 9-3, PageID.373–375.) So as to the key evidence on the key issue for trial, it is likely that Ewing was adequately prepared for trial. And Tietz has pointed to no evidence to the contrary. The Court finds that Tietz has not shown that Ewing did not adequately investigate his case.

Tietz also says that if the prejudice from each of counsel's alleged mistakes are aggregated, he was denied a fair trial. (ECF No. 1, PageID.33.) But for the reasons given, Tietz has not shown that any of counsel's alleged mistakes fell below professional norms. So this cumulative-error claim fails too.

In short, Tietz has not shown that his trial counsel's ineffectiveness warrants a writ of habeas corpus.

### C.

Tietz argues that prosecutorial misconduct deprived him of a fair trial. He says that the prosecutor improperly elicited testimony from a police officer who had found Tietz with a firearm a few months before the shooting. (ECF No. 1. PageID.38.)

To start, eliciting this testimony was not misconduct because the trial court expressly overruled defense counsel's objection and allowed the officer's testimony. (ECF No. 9, PageID.551–557.)

But, perhaps, Tietz means to say that the officer should not have been allowed to testify about his prior possession of a gun and the testimony deprived him of a fair trial. Even under this theory, habeas corpus relief is not warranted. First, the officer's testimony was very brief. Second, the officer told the jury that Tietz had a legitimate reason for having the firearm: "[Tietz] told me he delivers pizzas and that recently some of the people he worked with had been shot at, so he got the pistol for protection." (ECF No. 9, PageID.562.) Moreover, the fact that Tietz had a firearm months before he shot Miller had little bearing on Tietz's state of mind moments before he shot Miller, which, again, was the key question.

In all, introducing evidence that, a few months before the shooting, authorities found Tietz with a firearm was not so unfairly prejudicial that Tietz' rights under the Due Process Clause were violated. *See Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007) ("[D]ue process is violated, and thus habeas relief warranted, only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness.").

**D.**

Tietz also complains that the prosecutor engaged in misconduct by referencing the letter he wrote to Russell on cross and again at closing. (ECF No. 1, PageID.43.) In a closely related claim (which apparently was not part of Tietz's motion for relief from judgment and thus not addressed by the state trial court), Tietz argues that the trial court should have excluded the letter and not permitted the prosecution's comments based on the letter during closing. (ECF No. 1, PageID.54–55.)

To address these claims, some additional background is necessary.

At the start of trial, Tietz's trial counsel sought to exclude Tietz's letter to Russell. (ECF No. 9-3, PageID.207.) The prosecution argued that the letter would rebut testimony that Tietz was

"a peaceful person and not knowing a lot about weapons." (*Id.*) The court stated, "Well, don't use it until I have an opportunity to read it and make a ruling on the motion." (*Id.* at PageID.207–208.) Apparently, the court never made any ruling on the motion.

But then, on cross, this exchange between the prosecutor and Tietz occurred:

Q Who is Caretta Russell?
A Friends of a sister.
Q She's somebody you've kept in touch with since you've been arrested?
A No.
Q No?
A I've written her twice since I've been incarcerated.
Q Okay. So, you've written her a letter?
A Yes.
Q And in one of those letters, I told her, I got money, powers, rides and straps. You said that, didn't you?
A Yes.
Q And straps are guns, right?
A Right.

(ECF No. 9, PageID.645.) Then, on redirect, Tietz testified as follows: "A. I had received threats from people about if I ever come back to my neighborhood that I wouldn't leave alive. Q And, so, what was the point of writing that sentence in the letter? A. To intimidate 'em to not say them kind of things about me." (ECF No. 1, PageID.32.)

Then, at closing, the prosecutor referenced the letter and Tietz's testimony on redirect about the letter: "This Defendant, the man who likes to intimidate people. . . . And he was there, walked into this house, stood in this dining room with his strap, which, as you heard, is legal for gun—his gun. The gun that the night he had with him that he claimed he used for protection when he delivered pizzas. The gun the night before he put a bullet in the chamber. He wasn't delivering pizzas on that night in April in this house." (ECF No. 9, PageID.664.) The prosecution then called

Tietz an "intimidator" three or four times more. "Jade was going to leave because the intimidator was there. . . . The intimidator, the man who likes to wield his power and intimidate people needed to show that he's the one with the power. He's the one in control. He has his strap." (*Id.*) The prosecutor continued: "He wants people to be scared of him. This person, who watches the movies and studies the way you hold a gun to kill somebody, this person—and I apologize for the language—whoring around, being a bad-ass, didn't like this idea that somebody was joking with him, because that interfered with his sense of power, his sense of being the intimidator." (ECF No. 9, PageID.664–665.) Toward the end of her closing argument, the prosecutor told the jury, "He wrote a letter to somebody saying he had more straps. He knew a gun is a dangerous, lethal weapon." (ECF No. 9, PageID.668.)

Again, the trial court had expressly stated not to use the letter until it ruled on defense counsel's motion; and it appears that the court never ruled on that motion. Even so, the prosecutor brought up the letter on cross. And had the prosecutor not used the letter on cross, Tietz would likely not have said on redirect that the straps were to intimidate those who might retaliate against him. And without that testimony, the prosecutor likely would not have repeatedly called Tietz an "intimidator" during closing. Further, as stated, the sole issue for trial was Tietz's state of mind when he shot Miller.

That said, there was no contemporaneous objection to the testimony from either defense counsel or the trial court and so no reason for the prosecutor to think she could not use it in closing. And whether framed as a claim of prosecutorial misconduct or framed as the trial court's erroneous admission of evidence or failure to intervene, the question is whether the prosecutor's use of the letter and related testimony deprived Tietz of a fair trial. *See Parker v. Matthews*, 567 U.S. 37, 45 (2012) ("[A] prosecutor's improper comments will be held to violate the Constitution only if they

so infected the trial with unfairness as to make the resulting conviction a denial of due process."
(internal quotation marks omitted)); *Ege*, 485 F.3d at 375 ("[D]ue process is violated, and thus
habeas relief warranted, only if an evidentiary ruling is so egregious that it results in a denial of
fundamental fairness." (internal quotation marks omitted)). For at least two reasons, the Court
cannot find that the prosecutor's use of the letter or comments about Tietz at closing deprived him
of a fair trial.

First, the prosecution's use of the letter was arguably fair rebuttal given Tietz's theory of
the case. Tietz attempted to show that in the moments leading up to Miller's death, there was a
light-hearted or joking atmosphere. In his opening argument, Tietz's counsel told the jury,

> Now, James [Miller] teases Cameron [Tietz], after James tells Cameron that he has
> his ten dollars. He's joking and laughing and asks Cameron, what if I don't give it
> to you. He's kidding; he's joking; not being serious. Cameron teases back. Cameron
> takes the joking a little too far, but decides to one-up James and shows him he has
> a gun in his pants. Then James responds, according to one of the witnesses, you
> really going to pull out a gun on your boy over ten dollars. The witnesses stated
> that James was still joking around when he said this.

(ECF No. 9, PageID.374.) And on direct examination, Tietz testified, "I lifted my shirt up to show
my gun. And what happened next? [Miller] said, what are you going to do, shoot me. And he was
still laughing. And we was all laughing. I pulled my gun out and I kind of pointed it off to his side,
like they do in movies." (ECF No. 9, PageID.364–365.) Given Tietz's theory of the case and his
testimony (not to mention the testimony of other witnesses who said there was a joking
atmosphere) it was arguably fair for the prosecution to use the letter and associated testimony to
show that Tietz had a different state of mind when he pulled the trigger. Indeed, the prosecution
only brought up the letter after Tietz testified that he did not intend to intimidate people and denied
having a firearm: "[PROSECUTOR:] You shot [Miller] because . . . you felt like he was taking
some power away from you, and you wanted to show off in front of the others, correct? A. No. . . .

Q. Do you try to act like you have power to impress people? A. Yes. *Q. To try to intimidate people? A. No.* Q. Do you still own a gun now? A. Nope. *Q. Who is Caretta Russell? . . . .*" (ECF No. 9, PageID.644 (emphasis added).)

Second, even if there was some unfair prejudice from the prosecutor's use of the letter and comments during closing, Tietz's counsel took some of the sting out of the prosecutor's remarks. In his closing, Ewing told the jury, "Well, intimidator is what [the prosecutor] said. There's no evidence of that. In fact, [Tietz] was . . . welcomed [at the house]." (ECF No. 9-6, PageID.679.) Tietz's counsel also reminded the juror that a lawyer's statements (including the prosecutor's) are not evidence. (ECF No. 9, PageID.686.) He then argued, "Now, she sat here and said—she called him the intimidator and the girls didn't like him. Never said a word about being afraid of him. . . . They said they didn't like him; that he's a show-off. They don't like him. They didn't say they were scared of him. (Not discernable) a big intimidator." (ECF No. 9, PageID.686.)

Given that the prosecution's use of the letter and comments at closing were arguably fair impeachment and rebuttal to Tietz's theory of the case, and given that Tietz's counsel was able to address the prosecutor's remarks, this Court cannot say that the introduction of the letter and associated remarks by the prosecutor deprived Tietz of a fundamentally fair trial.

**E.**

Tietz also argues that the quality of the transcript of the jury selection prevented his appellate counsel from raising viable claims. (ECF No. 1, PageID.48.) In many places of the transcript, jurors are referenced as "unidentified juror" or "unidentified jurors." The transcript also states "no audible responses" with respect to some of the jurors' answers. Tietz argues that given these and other deficiencies in the trial transcript, "it is not possible to know what precisely took place during voir dire and which jurors were disqualified or which ones were selected." (ECF No.

14

1, PageID.49.) Tietz also says, "appellate counsel informed Mr. Tietz that he was not able to properly assess whether such juror(s) was removed from the jury, and if so, it was unclear whether such juror(s) was removed by either the defense or the prosecutor." (ECF No. 1, PageID.48.)

To start, a criminal defendant "'does not have a constitutional right to a totally accurate transcript of his criminal trial.'" *Carpenter v. Vaughn*, 296 F.3d 138, 155 (3d Cir. 2002) (quoting *Tedford v. Hepting*, 990 F.2d 745, 747 (3d Cir. 1993)). A defendant's constitutional rights are violated only if missing parts of the state record adversely affect the outcome of the criminal proceedings, such as by preventing or inhibiting meaningful review. *See Scott v. Elo*, 302 F.3d 598, 604–605 (6th Cir. 2002). The burden is on the petitioner to show prejudice. *Id.* (citing *Bransford v. Brown*, 806 F.2d 83, 86 (6th Cir. 1986)). He "must present something more than gross speculation that the transcripts were requisite to a fair appeal." *Bransford*, 806 F.2d at 86.

Here, Tietz has not produced enough evidence suggesting that had the transcript been more complete, appellate counsel would have been able to craft a viable claim on appeal. Tietz points out that some unidentified jurors indicated that they or their family members had been victims of assault. (ECF No. 1, PageID.48 (citing Transcript at 44).) But each of these jurors ultimately said they could be fair. (*See* ECF No. 9, PageID.236–239; Transcript at 41–44.) Tietz also points out that an unidentified juror had questions about sentencing. (ECF No. 1, PageID.48 (citing Transcript at 58–59).) That is true; but it appears that the unidentified juror ultimately stated that he or she understood that he or she could not consider the penalty. (ECF No. 9, PageID.238–239; Transcript at 58–59.) Tietz also claims that one "unidentified juror," a gun owner who was familiar with gun safety, said that he or she would have a problem returning a "not guilty" verdict on second-degree murder even if the shooting was accidental. (ECF No. 1, PageID.49 (citing Transcript at 74–77).) And, Tietz points out, another "unidentified juror" said that it "would be difficult" to find him not

guilty of second-degree murder unless he or she had other "options" for convicting. (ECF No. 1, PageID.49 (citing Transcript at 80–81).) Although the deficiencies in the transcript make it impossible to be completely certain, it appears that both the court and defense counsel recognized that the gun owner needed to be removed for cause and that he or she was, in fact, removed for cause. (*See* ECF No. 9, PageID.272 ("I think we've got a person . . . ."), PageID.276; Transcript at 77, 81.) As for the unidentified juror who needed "options," the court questioned that juror and it may be the case that the juror was also removed. (ECF No. 9, PageID.276; Transcript at 81.) Tietz does not allege (perhaps based on his or his trial counsel's recall) that this juror was not removed.

In short, Tietz has not provided enough evidence (or even allegations) to reasonably infer that had the transcript been more detailed or complete, his appellate counsel would have had a viable claim based on the jury selection.

## F.

Tietz next argues that he was deprived of due process because the jury was not given instructions relating to the reckless or negligent discharge of a firearm. (ECF No. 1, PageID.57; *see also* ECF No. 9, PageID.657–660.) Tietz argues that this was a lesser included offense that, under Michigan law, had to be given to the jury. (ECF No. 1, PageID.59 (citing Mich. Comp. Laws § 768.32(1).)

> The Michigan Court of Appeals addressed this claim on direct appeal:

> The trial court may not instruct the jury on cognate lesser offenses. [*People v. Cornell*, 646 N.W.2d 127, 139–40 (Mich. 2002).] The trial court must only instruct the jury on an offense that is supported by a rational view of the evidence when that offense is a lesser included offense.

> Here, Tietz concedes that reckless discharge of a firearm is a cognate lesser offense of second-degree murder. Presuming that it is a cognate lesser offense, Tietz was not entitled to any instruction on it.

16

Further, the jury was instructed on—and rejected—the lesser included offense of involuntary manslaughter. Thus, even if we presume that reckless discharge of a firearm is not a cognate lesser offense, any error was harmless.

We conclude that the trial court did not err when it refused to instruct the jury on reckless discharge of a firearm, regardless of whether an instruction on it might be supported by a rational view of the evidence.

*Tietz*, 2013 WL 3107325, at *2 (certain citations omitted, paragraphing altered).

Tietz has not shown that this is an unreasonable application of or contrary to any holding of the U.S. Supreme Court. *See* 28 U.S.C. § 2254(d). "[T]he Supreme Court has never held that due process requires the giving of jury instructions on lesser-included offenses in noncapital cases." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc); *McMullan v. Booker*, 761 F.3d 662, 667 (6th Cir. 2014).

And even if it is sometimes a due-process violation to not provide the jury with instructions for a lesser-included offense, Tietz has not shown (1) that reckless discharge of a firearm is *not* a *cognate* lesser offense or (2) that the Michigan Supreme Court's rule that a jury is not to be instructed on cognate lesser offenses runs afoul of the Constitution. Accordingly, Tietz is not entitled to habeas corpus relief on his jury-instruction claim.

## G.

Tietz claims that the trial court "failed to maintain the balance nice and true between the parties." (ECF No. 1, PageID.10.) In other words, he claims the trial judge was biased.

Tietz's claim that the trial judge was biased is entirely conclusory. (*See* ECF No. 1, PageID.61.) He has not established bias and certainly not bias that rises to the level of a due-process violation. The Court will not grant Tietz a writ of habeas corpus on this claim.

**H.**

Lastly, Tietz claims that his appellate attorney was ineffective for failing to raise on direct appeal the claims asserted in his petition for habeas corpus. (ECF No. 1, PageID.62.) And beyond that general assertion, Tietz specifically asserts that appellate counsel should have raised the following issues on direct appeal: (1) that trial counsel failed to disqualify jurors who were victims of assault, (2) that trial counsel failed to ensure that the transcript was accurate, (3) that trial counsel did not move for a mistrial (or, at least, object) when the prosecution used the letter to Russell, (4) that he told his trial counsel that he wanted to take a plea, but trial counsel refused on account of his relationship with the prosecutor and unpaid legal fees, and (5) that his trial counsel was not prepared for trial. (ECF No. 1, PageID.64–65.)

Except for Tietz's claim about his trial counsel's failure to interview or call witnesses, this Court has not addressed Tietz's claims under § 2254(d)'s deferential standard. And this Court has found that Tietz's claims do not have merit. Thus, largely for the reasons given, the Court finds that Tietz is not entitled to a writ on the basis that his appellate counsel was constitutionally ineffective. *See Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) ("Appellate counsel cannot be found to be ineffective for failure to raise an issue that lacks merit. Furthermore, the *Strickland* analysis does not require an attorney to raise every non-frivolous issue on appeal." (internal citations omitted).

**IV.**

For the reasons given, the Court DENIES Tietz's petition for a writ of habeas corpus. The Court further finds that reasonable jurists would not debate this Court's resolution of Tietz's claims, so a certificate of appealability will not issue from this Court. *See Slack v. McDaniel*, 529

U.S. 473, 483–84 (2000). If Tietz nonetheless chooses to appeal, he may proceed in forma pauperis. *See* 28 U.S.C. § 1915(a)(3).

SO ORDERED.

Dated: December 23, 2019

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 23, 2019.

s/Erica Karhoff
Case Manager to
Honorable Laurie J. Michelson